Filed 3/25/24  LePage v. Safeway CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THOMAS LEPAGE, | C097333 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2019-00260800-CU-WT-GDS) |
| v. | |
| SAFEWAY INC., | |
| Defendant and Respondent. | |

SUMMARY OF THE APPEAL

Following his termination from his position as a store manager/director for Safeway, Inc. (Safeway), plaintiff Thomas LePage filed an action against defendants Safeway, Helen Carver, Tina Jump, Jeff Mason, and Doe defendants.  Carver served as LePage's district manager.  Jump is a regional human resources manager for Safeway.  Mason is the vice president of human resources for Safeway.  The complaint alleged 17 causes of action.

Safeway filed a motion for summary judgment, which the trial court granted, finding none of LePage's claims had merit, and that Safeway was entitled to summary adjudication of each of them.

1

On appeal, LePage argues the trial court erred when it granted the motion for summary judgment with respect to his second cause of action, which alleged Safeway engaged in disability discrimination that is prohibited under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940, subd. (a); see also Gov. Code, § 12900 ["This part may be known and referred to as the 'California Fair Employment and Housing Act' "]).

We affirm the judgment on the grounds that Safeway has demonstrated it had a legitimate nondiscriminatory reason to terminate LePage, and LePage cannot show that stated reason served as a pretext for discrimination.

## FACTS AND HISTORY OF THE PROCEEDINGS

The following is a summary of the undisputed facts and evidence admitted on the motion in the trial court.

### LePage's General Employment Background and Training on Policies

Safeway hired LePage in 1977, where he began his career with the company as a food clerk. In September 1999, LePage became a store manager at a Safeway store in Elk Grove. In January 2015, LePage was transferred to a Safeway store in Rancho Cordova, and he remained the store manager there until he was terminated in July 2018.

As a store manager, LePage was an at-will employee.

LePage was trained on Safeway's policies prohibiting discrimination, harassment, and retaliation. As a store manager, LePage was expected to comply with and enforce these policies. LePage understood these policies prohibited discrimination and harassment on any legally protected basis including race, age, or disability. LePage also understood these policies applied to conduct by or against employees, customers, and vendors. Conduct that violates Safeway's polices against discrimination, harassment, and retaliation is grounds for disciplinary action, up to and including immediate termination.

2

LePage last acknowledged receipt of Safeway's Northern California Division Employee Policy Handbook and At-Will Employment Policy in May 2017. When deposed, LePage reviewed a copy of Safeway's Northern California Division Employee Policy Handbook and admitted to signing an acknowledgment of receipt of the handbook.

The handbook contains a section entitled, "Policy [A]gainst Harassment & Discrimination and Reporting Procedures." LePage admitted to being familiar with this policy. The policy states Safeway has zero tolerance for harassment or discrimination by any employee, customer, vendor, or third party based on an individual's actual or perceived race, color, religious creed, age, physical or mental disability, medical condition, gender, gender expression, or any other characteristic protected by law. It states that employees "must promptly report concerns of harassment, discrimination or retaliation," and provides a list of Safeway personnel to whom concerns can be directed. The policy states that retaliation for reporting complaints or participating in an investigation or proceeding related to a complaint is strictly prohibited, and that any perception of retaliation "should be reported immediately . . . so that the matter may be immediately investigated and remedied."

Safeway has a policy regarding "Courtesy, Dignity and Respect" that encourages employees to "conduct themselves professionally and in a manner that is respectful of other employees, customers, and vendors." Safeway also has a Code of Business Conduct that requires store managers to "act with the highest degree of honesty and integrity," treat others with "dignity and respect," ensure compliance with Safeway's policies and procedures, and handle complaints of misconduct in a prompt and appropriate manner. The Code of Business Conduct also requires employees to cooperate with internal investigations and "make complete and truthful disclosures when questioned about matters relating to [Safeway's] business about which the employee is aware." The Code of Conduct provides that a violation of its provisions is grounds for

termination. LePage acknowledged receiving copies of the Courtesy, Dignity, and Respect Policy and the Code of Business Conduct.

Complaints Prior to 2018

When he was deposed, LePage was asked if while he was employed at Safeway at least two people lodged complaints against him for sexually inappropriate comments. LePage said that in the 40 plus years he worked for Safeway, "there was a couple of instances that were ridiculous."

LePage admitted that there was an incident when he asked an employee the meaning of the term "DILF" (dad I'd like to fuck). LePage agreed he signed a copy of a June 20, 2008, warning letter regarding the alleged incident. LePage included a copy of this letter with the evidence he submitted in opposition to the motion for summary judgment. According to the letter, LePage had acknowledged asking a female employee the meaning of the term "DILF," but denied other allegations the employee had made regarding his conduct, namely that he also had asked the employee to place an olive on her finger so he could bite it off. The warning letter states, "[i]t is believed that your account of the conversation was not truthful and as a result you are being presented with this written warning." The letter reminded LePage that it was his responsibility to "support and promote a workplace free from all forms of harassment or discrimination" and that "[a]ny future behavior of this or a similar nature **will result in further disciplinary action up to and including termination.**"

During his deposition, LePage reviewed an August 18, 2010, final written warning regarding an incident during a meeting that took place on May 24, 2010. LePage agreed he had refused to sign the warning, and he stated he had refused to sign it because he thought it was "absurd." LePage provided a copy of the letter with his opposition papers, and his counsel declared it to be a true and correct copy. According to the letter, during a meeting at which Safeway's participation in the San Francisco AIDS walk was discussed,

4

LePage had told employees to expect to see celebrities and a lot of " 'fruitcakes' " at the event. According to the warning, LePage refused to acknowledge that the word "fruitcake" has any negative connotation. The warning reminded LePage that he had been issued a warning in 2008. The warning found that LePage's argument that the use of the word was not inappropriate to be "troubling" and that it suggested he did not understand the importance of his role as store manager in abiding by company policies and setting the correct tone for the store. At his deposition, LePage acknowledged he had used the word "fruitcake" in relation to the AIDS walk and maintained that he could not see how some might see the term as anti-gay.

The August 18, 2010, warning also states that during the same meeting, when LePage was asked about posting service information in the store in other languages, he responded with something to the effect of, "[i]f you live in America, you should learn to speak English." The warning observed that even if employees speak English, if it is their second language, their ability to provide better service to customers can be facilitated by providing materials in their first language. The warning reminded LePage that he must treat employees, customers, and vendors with professional and businesslike behavior at all times. It stated that future behavior of a similar kind could result in disciplinary action up to termination.

During his deposition, LePage admitted to being investigated regarding allegedly inappropriate sexual remarks sent in a text message in 2010. LePage acknowledged a female employee had filed a complaint stating LePage had sent her a text message asking, "[w]ho's got penis breath?" LePage acknowledged initialing his interview notes regarding the allegations. As part of his opposition papers, LePage also submitted what his counsel declared to be a true and correct copy of the investigative report and a true and correct copy of the interview notes regarding this complaint. According to the interview notes, LePage did not recall sending the text. Other documents in the report include a statement signed by the female employee, where she describes the text as

beginning with a voice asking, "[w]ho's got penis breath" and ending with a finger pointing to the recipient and saying, "[y]ou got penis breath." There is also an e-mail from another employee who describes the female employee receiving a text from LePage like the one the female employee alleged he sent.

In July 2017, Myron Naylor, one of LePage's subordinate employees, complained that LePage and other Safeway supervisors were more lenient with white employees than black employees. The complaint was corroborated as to the other employees, who were terminated, but not to LePage.

January through June 2018 Complaints, Incidents, and Investigation

From January through May 2018, LePage was the subject of various complaints made by Naylor and customers.

Both parties included with the evidence they submitted on the motion a copy of a document entitled "Tom LePage: 2018 Complaint Summary Investigation Conclusions" (Complaint Summary), which includes a summary of these complaints and the investigative conclusions made by Mason regarding those complaints. The Complaint Summary concludes with Mason's recommendation to Carver that LePage be terminated. The Complaint Summary begins by looking at the history of complaints and disciplinary actions against LePage. This includes notes on the aforementioned complaints and others and says that some incidents were not corroborated as to LePage or otherwise not found in violation of the law, this latter referring to an Equal Employment Opportunity Commission investigation.

LePage also produced what his counsel represented to be true and correct copies of (1) a July 20, 2018, incident report that included what appears to be transcripts of various interviews with Safeway human resources (HR) personnel and witnesses to some of the alleged complaints (incident report); (2) a May 1, 2018, customer complaint; and (3) a record of an interview between Mason and LePage on May 10, 2018.

6

The 2018 complaints and incidents that were pending investigation when Mason prepared the report are as follows:

### January 2018 Complaint

In January 2018, Naylor made a complaint alleging LePage denied his requested days off and accommodated a white employee's requests for time off. Mason testified in a deposition that he directed an HR manager to investigate the complaint.

According to the Complaint Summary, an assistant store director reported that LePage had acknowledged he knew Naylor wanted Saturdays off, but said that Naylor could just "keep calling in sick if that's what he wants to do." The Complaint Summary also states the assistant store director reported the store had enough employees to work in Naylor's department on Saturdays. Notes of an interview between Jump and the assistant store director contained in the incident report support that the assistant store director said these things.

According to the Complaint Summary, LePage explained he set the schedule for the department using a specific software program, mySchedule, and tried to accommodate handwritten requests for time off, and Naylor never used the software to seek time off. The Complaint Summary states HR determined Naylor was not using the software because he did not have a computer, and then they assisted Naylor to request days off on the store's computer. According to the Complaint Summary, Naylor's request for Saturdays off was then accommodated. According to the Complaint Summary, a division trainer said he shows all store managers how to manually enter employee requests for days off and that they should accommodate employees who don't use the software.

In interview notes contained in the incident report, it appears Naylor explained to Jump that he had tried to take Saturdays off in part of 2017 to coach t-ball, but he had to call in sick sometimes to get the Saturdays. He said he had not put in a request for 2018

7

yet, because he believed a black man was not going to get the time off he needed. He also reported making a verbal request to get January 5 and 6, 2018, (a Friday and Saturday) off with an employee named Kieman, but then did not get them. The interview notes also reflect Jump providing Naylor with a booklet on how to use mySchedule and telling him he could call a help desk or her if he needed help using the program.

In the interview notes for LePage's interview by Jump, LePage states he did not know Naylor wanted January 5 and 6 off, and that Naylor had not spoken with him about his coaching needs in 2018.

In a Friday, December 29, 2017, e-mail contained in the incident report, LePage wrote he was not aware that Naylor wanted the Friday and Saturday off until he was told about it from a union representative after Naylor called the representative to complain. LePage wrote in the e-mail, " 'REQUESTED DAY OFF' was never written on the paper schedule my produce manager turned in, only the word 'OFF' was written and [Naylor] never requested the days off in the 'mySchedule' program as all employees are required to do so that the manager can approve or decline them."

Regarding this complaint, the Complaint Summary concludes that LePage "was aware that [Naylor] wanted Saturdays off. He discussed this with [an assistant store manager]. Yet, he relied on [the software program] and did not proactively meet with [Naylor] to find out why [Naylor] was not using [the software] nor [to] discuss an alternative method by which [Naylor] could communicate his schedule preferences. [LePage] failed to offer support and guidance to an employee he was aware wanted Saturdays off."

March 15, 2018, Complaint

On March 15, 2018, Naylor made a complaint of discrimination and retaliation alleging that LePage refused to sign his sick leave form in retaliation for his prior complaints of discrimination against the defendant. In his deposition, Mason testified he

8

directed an HR manager to look into this complaint, and he recalled speaking with both Carver and the HR manager about it.

The Complaint Summary says the following regarding the incident and investigation into it: Naylor alleged when he arrived to work on March 15 at 5:00 a.m., he gave LePage a doctor's note excusing an absence and asked LePage to sign a sick leave form, which LePage needed to sign for Naylor to be paid for a sick day. Naylor said he needed the form back at 10:00 a.m. when his shift ended, but when Naylor clocked out at 10:39 a.m., the form had not been prepared. Naylor waited outside the breakroom, knowing LePage was inside. Naylor called the union and then clocked back in at 11:22 a.m. According to Naylor, he then looked in the breakroom and slammed the door. Carver reported she asked LePage "what was that?," and LePage told her Naylor was upset because Naylor wanted LePage to sign a sick leave form "and I don't have time." Carver said she told LePage to just go take care of it, but instead LePage stayed and had a second piece of cake, only leaving the breakroom once another employee alerted LePage that Naylor was still on the clock. Naylor alleged that when he and LePage had a heated discussion about the note LePage asked him, "are you serious?" referred to him as "Boy," and said, "I'm sick of you guys." LePage denied calling Naylor "Boy" or saying, "I'm sick of you guys." LePage said it takes him between five and 30 minutes to fill out a sick leave form, while an assistant store manager stated forms can be completed in five to 10 minutes.

After the incident, Naylor complained to HR that LePage had delayed preparing the form to retaliate against Naylor and to upset him. Naylor also said LePage was collecting statements about the incident. When asked if he was collecting statements, LePage said Jump had directed him to. Jump denied making this recommendation and said she only asked for the statements after LePage reported having them. In another interview, with Jump present, LePage said it was Jump or Carver who told him to collect

9

statements, or possibly neither of them. LePage denied conducting his own investigation and said he collected statements because it was what he had always done.

In interview notes which are contained in the incident report reflecting Jump's and Carver's interview with LePage as to this complaint, LePage said it could take five to 30 minutes to fill out the form. He said Naylor did not tell him when he needed the note when he tried to hand it to him, and LePage said he has never been told the paperwork needs to be done immediately for someone. When asked if it would have been a good idea to just fill out the paperwork, LePage said he would not have done it for other employees.

In interview notes reflecting an interview between the assistant store manager and Jump, which are contained in the incident report, the assistant store manager estimated the form Naylor needed takes five to 10 minutes to fill out.

The incident report also contains a handwritten note that appears to be taken while someone watched a video that showed at 11:10 a.m. LePage was in the breakroom and Naylor saw him. According to the note, LePage remained in the breakroom, eating a second piece of cake, and left at 11:24 a.m.

The incident report also contains a copy of interview notes that appear to be from an interview of Carver by Jump. According to the notes, on March 15, 2018, while in the breakroom, Carver heard a thud at the door and when she asked what was going on, LePage told her it was Naylor, who was upset because he wanted LePage to sign his sick leave form and LePage did not have time. Carver reported she told LePage to "Just go sign it, just go take care of it." Carver said LePage said Naylor was getting in his face, but she felt LePage escalated the situation. She thought LePage was irritated that Naylor stayed on the clock and that he should have just filled out the form. She did not hear LePage say, "are you serious" and "I'm sick of you guys."

With respect to this incident, the Complaint Summary concluded that while initially LePage may have been busy, by the time Naylor entered the breakroom it was an

10

hour after his shift and LePage knew he was upset.  Carver told LePage to leave and go sign the form, but LePage stayed on until another employee told him Naylor was on the clock.  The Complaint Summary states that LePage's "poor judgment escalated the situation leading to a confrontation that could have been avoided."  The Complaint Summary also concludes LePage was "less than forthcoming" when he estimated it could take 30 minutes to complete the form, and that he had used poor judgment in collecting third party statements about Naylor's behavior instead of leaving that task to a neutral third party.

<u>Naylor's</u> <u>Other</u> <u>March</u> <u>2018</u> <u>Complaints</u>

In March 2018, Naylor made additional complaints about LePage, alleging further mistreatment by LePage based on race, and raising concerns about LePage's management style and the way he treated people.  At his deposition, Mason said he directed an investigation into these complaints, and said he had reviewed the investigation and the conclusions of the investigation.

According to the Complaint Summary most of these complaints were "[n]ot corroborated."  However, with respect to a report regarding LePage's interactions with two women employees, the Complaint Summary concludes that LePage had "used poor management style and did not treat these employees professionally, with courtesy, dignity and respect."  With respect to another incident, it concluded LePage had "participated in a conversation with at least one non-management employee concerning a sensitive and confidential subject matter and started or furthered a rumor circulating in his store.  Far from trying to 'stop gossiping,' [LePage] participated in it."  The conversation concerned a rumor that store managers at another location who had been terminated had been set up.

Interview notes contained in the incident report show that the two women told HR representatives that LePage had said things to them that made them cry.  One of the

11

women reported that LePage treats men and women differently, having an attitude with women but treating men with respect. According to the interview notes, she said she tries to stay away from LePage because he makes her anxious and nervous. According to the notes, the other woman said she had some concerns with LePage, and that with him, "[t]he more you fight it the worse it is going to be."

According to the notes from Jump's interview with the assistant store manager, the assistant store manager saw LePage speak with one of the two women, and the assistant store manager said LePage had said to the employee that she was lucky he was not there when she was on probation, because she would not have passed. The assistant store manager felt there was no reason for LePage to say that to the employee, and that it was rude, taking on the tone of a threat that he was going to keep a close eye on her work.

According to what LePage's counsel represented to be a true and correct copy of a record of an interview between Mason and LePage on May 10, 2018, when Mason interviewed LePage, LePage admitted to speaking with an employee about a rumor that employees at another store who had been fired after a noose was found in the office had been set up.

### Yelp! Review Incident

In April 2018, an employee at the Rancho Cordova store reported to Safeway that they read a September 2017 Yelp review in which the reviewer alleged that during a job interview "manager tom" tried to touch her and refused her employment because she denied his touch. In his deposition, Mason stated he personally interviewed LePage about this incident.

In the record of the May 10, 2018, interview between Mason and LePage, after Mason presented the Yelp! review to LePage, LePage said he heard about it from an employee and that the review was fabrication. He said the employee told him about it in December or February 2018. When asked if he told Carver about the review, LePage

said he did but that he did not recall the conversation. LePage said he was on leave and "kind of blew it off." LePage said he may have e-mailed Carver and would check his e-mail file.

In interview notes from a May 22, 2018, interview between Mason and LePage, which are contained in the incident report, Mason brought up the review again. Mason asked if LePage had found a copy of an e-mail to Carver reporting the Yelp! review. LePage said: "When I looked at the dates, I realized it was the day my Grandson had passed. I have a personal message that was sent to me. They had taken a picture of it and sent it to me. I think I called her. And told her that I am not sure where this is coming from." He insisted he called Carver after Mason told him Carver had said he never reported the Yelp! review to her—verbally or in writing. Mason pressed further, saying Carver said she would have immediately turned the report over to another HR employee and the database of incidents had no report of this. LePage said he was sure he did, but given the circumstances with his grandson there was a 1 percent chance he had not.

Mason's conclusion, contained in the Complaint Summary, notes that HR was unable to investigate the claim made in the Yelp! review. However, it states LePage "has been trained that it is mandatory for Store Managers to report all complaints of sexual harassment for investigation. He admits knowing he was accused of a sexual touching. He was less than forthcoming when asked if he notified [Carver] about the complaint, answering both yes, and that he blew it off (no?) [*sic*], and then that he was sure that he had done so, followed by that he could not remember due to his family loss. We conclude he took no action to report the complaint in violation of company policy requiring he do so."

### May 1, 2018, Customer Complaint

On May 1, 2018, Safeway received a customer complaint of race discrimination in which the customer alleged LePage did not allow her disabled black son to use the store's

motorized shopping carts. The customer further alleged that when she objected to LePage's actions, he called the police and had both her and her son removed from the store. At his deposition, Mason testified he directed an HR manager to conduct an investigation into this incident and personally spoke with LePage about this complaint. In his deposition, LePage also acknowledged speaking with Mason about this complaint.

According to the Complaint Summary, LePage said he asked the boy if he was disabled, and the boy said yes. He said he questioned the boy because there was a history of kids messing around with the carts while elderly customers waited. LePage maintained the boy was not disabled because he had no outward appearance of disability, and he was not paralyzed because he was moving his arms. According to the Complaint Summary, LePage called the police because the mother was out of control and cursing— police reporting says LePage said the customer "went off on him" and he wanted her removed. The Complaint Summary states the police records reflect LePage did not report seeing the customer misuse the cart or receiving customer complaints about it, and LePage told the police he did not believe the customer's statement that her son was paralyzed.

The record of a May 10, 2018, interview between LePage and Mason; notes from a May 22, 2018, interview between Mason and LePage contained in the incident report; and the copy of the customer complaint LePage submitted with his opposition papers support Mason's summarization of the incident and the various involved parties' statements regarding it.

With respect to this incident, the Complaint Summary concludes by noting that LePage has been trained with a service animal policy that notes not all disabilities are visible. It concluded the customer's son did not misuse the cart. It also concluded, "[t]o provide good customer service, [LePage] should have worked to defuse the situation when the boy's mother complained and confirmed her son's disability, including apologizing to the customer for his misunderstanding."

14

### May 2, 2018, Customer Complaint

On May 2, 2018, Safeway received a customer complaint of race discrimination in which the customer alleged that LePage denied the customer's Hispanic 12-year-old son the use of the restroom in the store's fuel center because he had not yet purchased fuel. Mason testified at his deposition that he directed an HR manager to investigate this incident. The record of the May 10, 2018, interview between LePage and Mason, and the interview notes reflecting a second meeting between the two dated May 22, 2018, also suggest Mason personally spoke with LePage about this complaint.

According to the Complaint Summary, the customer said LePage told him the restroom was for customers only and there had been a problem with the homeless. The customer said when he tried to explain he was a regular customer, LePage cut him off and directed him to leave the premises. The Complaint Summary quotes an interview with LePage, in which he says there is no written notice in the store about restroom use, just at the fuel station. LePage said there is a sign at the fuel station saying the restroom is for customers only. He said recently there had been a complaint that a customer could not use the restroom, and LePage said he told the customer he had given his son the key. According to the Complaint Summary, LePage said he inherited the sign posted at the fuel station, he never discussed the sign with Carver, and the Sacramento District Attorney wants him to keep those restrooms locked to keep out the homeless.

The Complaint Summary concludes that LePage used poor judgement and gave poor service to a customer, strictly enforcing a supposed policy without hearing the customer out. The Complaint Summary concluded LePage should have listened to the customer and apologized to him.

### May 2, 2018, Issue with a Vendor Employee

According to the Complaint Summary, on May 2, 2018, LePage told Carver he had told a supervisor for a third-party vendor that one of the vendor's employees had

engaged in suspicious behavior and should not be returned to the store. LePage had forwarded an e-mail from the vendor in which the vendor sought a brief statement from LePage, and LePage asked Carver if he could comply with the request. In the e-mail to Carver, LePage wrote, "I was told it was not for sure but her actions were very suspicious in nature. I had the supervisor call me so I could ask him to not have this person return to my store for future resets and now he sent me this e-mail. I explained we had no exact proof but that his own people witnessed her leaving the store holding her coat low, going to her car, opening the trunk and something being put into it." According to the Complaint Summary, LePage said he did not ask the vendor supervisor to call him, but told the on-site lead that he did not want the employee assigned to his store, which resulted in the supervisor calling him. He did not feel the request that she not be assigned to his store without further investigation was improper, because he was only reporting what the vendor's on-site lead reported to him, and he did not want her at his store because she was acting suspiciously and not doing her job.

At his deposition, Mason testified he was personally involved in the investigation into this matter, interviewing LePage, an asset protection manager, and the vendor supervisor. The notes contained in the incident report from Mason's May 22, 2018, interview with LePage supports Mason's summary of the facts in the Complaint Summary.

The Complaint Summary concludes, regarding this incident, that LePage used poor judgment in communicating to the vendor that an employee suspected of theft should not be returned to his store. The Complaint Summary notes LePage's actions could have led to that employee's termination, which would have exposed Safeway to legal claims.

16

Incidents During the Investigation into Complaints

Carver instructed LePage not to discuss the complaints made against him—including the complaints made against him by Naylor—with his employees.

According to the Complaint Summary, on June 14, 2018, Naylor alleged that he had a conversation with LePage in which LePage said he could not believe Naylor was accusing him of racism, and that he was not worried about the investigation because he had done nothing wrong. According to the report, Naylor said LePage said something to him of the effect that "we never had this conversation."

At his deposition, LePage discussed a one-on-one conversation he had with Naylor, though he was unclear on the exact date of the conversation. LePage testified that Jump had asked LePage if he had ever just sat down with Naylor to talk. He said sometime after that, Naylor came in the office and sat down, and they both got emotional. According to LePage, during the conversation he was doing what he thought Jump wanted him to do to try to settle the issues between him and Naylor. LePage said he told Naylor that Naylor did not know him or his life. He told Naylor about how his daughter had a black high school boyfriend whose mom kicked him out. LePage said he and his then-wife brought the boy into their home, and when they found out he had gotten into Brown they bought his plane ticket and supplies, and paid for his first semester of school. LePage said he told Naylor that because of this he could not believe that Naylor would think LePage was the issue. LePage said he told Naylor his problem was with Safeway, not LePage, and that he told Naylor he should do what he needed to do if he was being treated unjustly, but it was not LePage. LePage testified that it was on the day of this personal conversation when he said he was not a racist. LePage testified that it was during this conversation that he said he wasn't worried because he hadn't done anything wrong. LePage testified he did not know if he said, "[w]e're not supposed to have this conversation," but he did tell Naylor that "[Jump] had said we should sit down and talk,

17

see if [they] could talk this out. . . . And that, 'They advised [him] that [he] shouldn't talk to [Naylor], but [they] got to get this settled.' " LePage then changed direction, saying it was Naylor who had said, "[w]e need to talk. We need to get this settled." Later, LePage testified that he was told by Jump and Carver he shouldn't discuss the case with Naylor, but believed he was getting mixed signals. He clarified that Jump did not instruct him to sit down with Naylor, but had asked if he had ever sat down and talked to Naylor one-on-one.

LePage refers to a June 14, 2018, conversation between him and Naylor in the declaration he submitted in opposition to the motion for summary judgment. According to the declaration, Naylor approached LePage to discuss his grievances against LePage and Safeway in general. LePage told Naylor he felt he had done nothing wrong in his conduct with Naylor or any other employee. According to the declaration, LePage did not say, either explicitly or implicitly, that Safeway would take no disciplinary action against him.

The Complaint Summary concludes that LePage violated the instruction he admitted to receiving to not discuss Naylor's complaints with anyone but Carver and HR. It concludes LePage's statements were contrary to Safeway policies, including those regarding retaliation, and insubordinate as they disregarded an instruction to not discuss the investigation.

On June 15, 2018, after LePage had a conversation with Naylor, Naylor reported to Safeway that LePage made an inappropriate remark to him. Naylor refused to disclose the substance of the remark. According to LePage's declaration, all that happened in the conversation was that, as LePage was headed out to a meeting at Safeway's district office, he stopped and thanked Naylor for working overtime on a project and shook Naylor's hand.

On June 15, 2018, Carver and Jump met with LePage and placed him on administrative leave pending completion of the investigation into the complaints against

18

him. Carver and Jump instructed LePage not to contact store employees while he was out on administrative leave pending the completion of the investigation.

After LePage was placed on paid administrative leave, Safeway granted his request for a medical leave due to his back pain from June 18, 2018, through July 31, 2018. LePage submitted a copy of the June 24, 2018, e-mail he received from Mason granting his request for medical leave.

According to the Complaint Summary, while LePage was on leave, LePage called the store to say he was on a medical leave of absence. A booth clerk reported LePage called and asked for Assistant Manager Heather and when Heather was not available told the clerk he was on medical leave. According to the Complaint Summary, LePage refused to participate in a phone interview regarding the new allegation, citing his leave status. A document in the incident report suggests that Naylor called Jump on June 21, 2018, to report that LePage had called the store and reported to an employee that he would be out until July 2018 due to a back injury. In an e-mail to Mason, which LePage submitted in opposition to the motion, LePage said he could not take calls from Mason due to his medical condition, and said he would discuss work matters when he returned to work.

Other Details Regarding LePage's Employment History

Prior to 2018, LePage took approved leaves of absence from Safeway (1) from August 9, 2003, through November 3, 2003; (2) December 15, 2010, through January 4, 2011; (3) December 14, 2016, through January 7, 2017; and (4) October 1, 2017, though December 28, 2017.

Safeway granted LePage's request for time-off to care for his mother-in-law even though caring for a parent-in-law is not a qualifying reason for family leave under the Family and Medical Leave Act or the California Family Rights Act. This leave of absence was the one LePage took in October through December 2017.

In his deposition LePage admitted that he was unaware of any derogatory statement about his alleged disability made by any employee, manager, or supervisor with Safeway.

Decision to Terminate LePage

After considering the various complaints made against LePage, the Complaint Summary concludes, "[d]espite his prior training and experience, store manager [LePage] demonstrated a complete lack of judgment and that he is unwilling or unable to treat people (employees and customers alike) in a professional manner, with courtesy, dignity and respect.  It should also be noted that [LePage] has received prior complaints about his inappropriate behavior that resulted in warning notices issued to him.  [¶]  Most concerning is that [LePage] violated an instruction not to discuss a pending investigation with anyone other than HR and district manager Helen Carver and he told [Naylor] nothing would happen to him as a result of his complaint.  [¶]  [LePage's] conflicting and changing versions of events also strongly suggests he was not being truthful during investigation interviews; he seemed to be telling us what he thought was the correct answer rather than the truth, which is what we require in the Code of Business Conduct. . . . .  [¶]  Trust is essential to the employment relationship; yet, we have lost trust and confidence in [LePage's] ability to perform his management role in a way that is consistent with Safeway's policies and conduct standards.  [¶]  Based on the above, I recommend the termination of [LePage's] employment."

On July 12, 2018, Mason sent Carver an e-mail with the Complaint Summary, recommending Safeway terminate LePage due to various violations of company policy. Carver agreed with the recommendation.

As part of their moving papers, Safeway submitted a copy of the July 17, 2018, termination letter Carver wrote to LePage.  LePage also submitted a copy with his opposition papers.

20

Carver began the letter by reminding LePage that on June 15, 2018, it had been alleged, and determined credible, that he had met with an employee who had made a complaint about him and asked why the employee made the complaint while an investigation into that employee's complaints and two customer complaints were pending. Carver wrote that during the conversation LePage had said to the employee " 'we did not have this conversation.' " She noted that, as a result, it was determined LePage could no longer be trusted to remain in the workplace pending the investigation.

Carver continued, noting that it had been revealed that, contrary to instructions for LePage not to contact store employees, LePage had called the store and spoken with at least one employee while on leave.

Carver wrote, "[b]ased on the investigation, including your admissions, we conclude you have engaged in conduct contrary to numerous employee conduct standards including the company's harassment and retaliation policies, about which you have been trained and warned. You have also demonstrated a lack of good judgment and professionalism that is required of Safeway Store Directors and your conflicting and changing versions of events, as well as your meeting with the complaining employee and subsequent contact with your store, all contrary to explicit directions, further supports you have violated Safeway's Code of Business Conduct."

Carver wrote, "[t]rust is essential to the employment relationship. As a result of the investigation conclusions, as well as your prior history of complaints, we have lost trust and confidence in your ability to perform your management role in a way that is consistent with Safeway's policies and conduct standards."

DISCUSSION

I

*General Standards of Review on Motions for Summary Judgment*

A court must grant a motion for summary judgment when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "[T]hat is," the court must grant the motion if, "there is no issue requiring a trial as to any fact that is necessary under the pleadings and, ultimately, the law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*); see also *Martine v. Heavenly Valley Limited Partnership* (2018) 27 Cal.App.5th 715, 721.) In moving for summary judgment, defendants have the burden to show that the cause of action has no merit because an essential element cannot be established or there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at pp. 850, 861.)

Our review of the record and the trial court's decision is de novo, and we review the evidence in the light most favorable to the opposition to the motion. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003; see also *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 859 (*Serri*).) "We are not bound by the trial court's reasons for granting summary judgment because we review the trial court's ruling, and not its rationale." (*Avidity Partners, LLC v. State of California* (2013) 221 Cal.App.4th 1180, 1192.) However, "[o]n appeal, the trial court's judgment is presumed correct, and the burden is on the Appellants to demonstrate reversible error. [Citation.] This is true even on de novo review" of orders granting summary judgment. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 708; see also *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 554-555 [de novo review is limited to issues adequately raised and supported in an appellant's opening brief, and " ' "[t]he most fundamental rule of appellate review is that an appealed

judgment or order is presumed to be correct." [Citation.] It is the appellant who bears the burden of overcoming that presumption.' [Citation.]"].) Thus, "[a]lthough our review of a summary judgment is de novo, it is limited to issues which have been adequately raised and supported in [the appellant's] brief." (See *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6; *Davies v. Sallie Mae, Inc.* (2008) 168 Cal.App.4th 1086, 1096.)

Thus, an appellant challenging a trial court's granting of a motion for summary judgment must comply with rule 8.204(a)(1) of the California Rules of Court. This rule includes a requirement to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (*Id.* at (a)(1)(C).) While the evidence submitted is important, "we will not scour the record on our own in search of supporting evidence" and if a party fails to direct us to where in the record we can find the necessary evidence, "they cannot complain when we find their arguments unpersuasive." (*Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1149.)

Citations to factual statements made in briefs in the trial court—particularly when portions of those briefs themselves lack citations to specific pieces of evidence—do not satisfy this burden. (Cf. *Parker v. Wolters Kluwer United States, Inc.* (2007) 149 Cal.App.4th 285, 290-291 [refusing to consider arguments made in the trial court incorporated by reference into appellate briefs due to lack of compliance with the requirements of California Rules of Court, rule 8.204(a)(1)(B) which govern the need to provide citations for arguments].)

For example, LePage has not included a clearly labeled "Statement of Facts" in his opening brief, but a "Case Summary" that he begins with a section that says following his request for medical leave, Safeway began to investigate his alleged misconduct. Presumably, this is the first place we are meant to look to determine if LePage has satisfied the California Rules of Court, rule 8.204(a)(2)(C) requirement that an appellant's opening brief contain a summary of facts. The factual statements in this

section often lack record citations to evidence. For example, LePage says that when Safeway investigated allegations of his misconduct he "provided Safeway with an explanation for his conduct that was consistent with Safeway's corporate policies." To support this argument, he cites to his entire opposition brief to the motion for summary judgment that he filed in the trial court. This did not satisfy his burden to cite to evidence in the record to support this statement.

II

*FEHA and Motions for Summary Judgment of FEHA Discrimination Claims*

Under FEHA, "[i]t is an unlawful employment practice . . . [¶] [f]or an employer, because of the . . . physical disability, . . . [or] medical condition . . . of any person, . . . to discharge the person from employment . . . , or to discriminate against the person . . . in terms, conditions, or privileges of employment." (Gov. Code, § 12940, subd. (a).)

"In analyzing claims of discrimination under FEHA, California courts have long used the three-stage burden-shifting approach established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [] for the analysis of title VII (42 U.S.C. § 2000e et seq.) employment discrimination claims. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2 []; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 [] (*Guz*) ['[b]ecause of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes'].) The *McDonnell Douglas* test 'reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained.' (*Guz*, at p. 354; accord, *Serri*[*, supra,*] 226 Cal.App.4th [at p.] 860 [].)" (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1181 (*Husman*).)

24

Under the *McDonald Douglas* test in stage one, "the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz, supra,* 24 Cal.4th at p. 355; see also *Husman*, *supra*, 12 Cal.App.5th at p. 1181; see also *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067-1068.) "If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises." (*Guz*, at p. 355.)

Once an employee establishes a prima facie case and the presumption of discrimination arises, in the second stage the employer must offer a legitimate nondiscriminatory reason for the adverse employment action. (*Guz*, *supra*, 24 Cal.4th at pp. 355-356.) "If the employer sustains this burden, the presumption of discrimination disappears." (*Id.* at p. 356.)

In the third stage of the analysis, "[t]he plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. [Citations.] In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias. [Citations.] The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (*Guz*, *supra*, 24 Cal.4th at p. 356.)

With a motion for summary judgment "[i]n an employment discrimination case, the employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of the plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors. (Code Civ. Proc., § 437c, subd. (p); *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 203 [].)

"In meeting its initial burden the employer need not rely upon the premise that the plaintiff cannot demonstrate a prima facie case if the employer can set forth admissible evidence of its reasons, unrelated to unlawful discrimination, for the adverse employment action. (*Guz*[, *supra*,] 24 Cal.4th [at p.] 357 [].)" (*Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1003 (*Hicks*).)

"If the employer meets its initial burden [on a motion for summary judgment] in this manner, the plaintiff then has the burden to produce 'substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 [].)

"The plaintiff must do more than raise the inference that the employer's asserted reason is false. '[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.' (*St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 515 [].)  If the plaintiff produces no evidence from which a reasonable fact finder could infer that the employer's true reason was discriminatory, the employer is entitled to summary judgment. (*Caldwell v. Paramount Unified School Dist.*, *supra*, 41 Cal.App.4th at p. 203.)" (*Hicks*, *supra*, 160 Cal.App.4th at p. 1003; see also *Serri*, *supra*, 226 Cal.App.4th at p. 862 ["It is not sufficient for an employee to make a bare prima facie showing or to simply deny the credibility of the employer's witnesses or to speculate as to discriminatory motive. [Citations.]  Rather it is incumbent upon the employee to produce 'substantial responsive evidence' demonstrating the existence of a material triable controversy as to pretext or discriminatory animus on the part of the employer.  [Citations.]"].)

" '[T]he great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its

actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory.' (*Guz, supra,* 24 Cal.4th at pp. 360–361, fn. omitted.)" (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1531, fn. omitted.)

III

*Safeway Met its Burden to Show a Legitimate Nondiscriminatory Reason*

An employer may satisfy its initial burden on a motion for summary judgment on a discrimination claim arising from an employee's termination by establishing it had a legitimate, nondiscriminatory reason to terminate the employee. (See *Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 160.) "If, as here, the motion for summary judgment relies in whole or in part on a showing of nondiscriminatory reasons for the discharge, the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for the termination." (*Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1097-1098.) "[A]n employer need not have good cause to terminate an at-will employee. The reason for termination need not be wise or correct so long as it is not grounded on a prohibited bias. [Citation, fn. omitted.] [¶] An employer's burden can be met by producing evidence of one or more reasons for the adverse employment action that were 'unrelated to unlawful discrimination.' [Citations.]" (*McGrory, supra,* 212 Cal.App.4th at p. 1524, fn. omitted.)

" '[L]egitimate' reasons . . . in this context are reasons that are facially unrelated to prohibited bias, and which, if true, would thus preclude a finding of discrimination." (*Guz, supra*, 24 Cal.4th at p. 358; see also *Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1158 (*Featherstone*).) "The employer's evidence must be sufficient to allow the trier of fact to conclude that it is more likely than not that one or more legitimate, nondiscriminatory reasons were the sole

27

basis for the adverse employment action." (*Featherstone*, *supra*, 10 Cal.App.5th at p. 1158.)

Here, the undisputed facts and evidence are sufficient for a trier of fact to conclude it is more likely than not that Safeway terminated LePage because, at the completion of its investigation into numerous complaints about LePage's actions, Mason concluded LePage had violated company policies and found Safeway could no longer trust LePage. Both breaches of company policy and a loss in confidence in an employee are legitimate nondiscriminatory reasons to terminate an employee. (See *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 432-433 (*King*); *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 352 (*Arteaga*); *Serri*, *supra*, 226 Cal.App.4th at p. 861; *Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 56.)

In the argument section of his opening brief, LePage does not adequately dispute that Safeway offered a legitimate nondiscriminatory reason to terminate him. Instead, he focuses his discussion regarding the conclusion of Safeway's investigation on efforts to prove that Safeway's conclusions were wrong, and, therefore, that these conclusions do not provide enough evidence to support a finding on a motion for summary judgment that he was not competent. But Mason's conclusion the LePage had violated its policies and finding that Safeway had reason to have lost confidence in LePage did not need to be correct to be legitimate. An honest belief in those findings is enough. (See *King*, *supra*, 152 Cal.App.4th at p. 433 ["According to UPS's evidence, the decision makers entertained an honest belief that plaintiff had either personally falsified a driver's timecard or directed the driver to do so. For purposes of establishing the moving employer's initial burden of proof, it does not matter whether plaintiff actually did commit an integrity violation as long as UPS honestly believed he did"]; see also *Hersant*, *supra,* 57 Cal.App.4th at p. 1005 [" 'The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is

28

wise, shrewd, prudent, or competent' "]; accord *Arteaga*, *supra*, 163 Cal.App.4th at p. 343.)

The evidence presented to the trial court established that Mason oversaw an investigation into numerous complaints about LePage's behavior in the first half of 2018, where witnesses gave accounts of LePage engaging in behavior that Mason could fairly conclude reflected poor judgment on LePage's part. Mason also had reason to believe that during the investigation, LePage acted contrary to directives and spoke with one of the primary complainants about whether one could fairly accuse LePage of being a racist. When Safeway placed LePage on leave pending the investigation and told him not to call the store, he called the store. Indeed, in his deposition, LePage admitted he had some sort of conversation regarding whether he could fairly be called a racist with Naylor, and there is no dispute that LePage called the store while on leave. Mason's fairly reached conclusions supplied a legitimate reason to terminate LePage.

IV

*LePage Has Failed to Demonstrate Safeway's Reason is Pretext*

"Once an employer satisfies its initial burden of proving the legitimacy of its reason for termination, the discharged employee seeking to avert summary judgment must present specific and substantial responsive evidence that the employer's evidence was in fact insufficient or that there is a triable issue of fact material to the employer's motive. [Citations.] . . . [¶] While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor, plaintiff's evidence remains subject to careful scrutiny. [Citation.] We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' (*Aguilar*[*, supra,*] 25 Cal.4th [at p.] 850 [].) Moreover, plaintiff's subjective beliefs in an employment discrimination case do not create a

29

genuine issue of fact; nor do uncorroborated and self-serving declarations. [Citations.] And finally, plaintiff's evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination." (*King*, *supra*, 152 Cal.App.4th at pp. 433-434; see also *Serri*, *supra*, 226 Cal.App.4th at pp. 861-862; *Hersant, supra,* 57 Cal.App.4th at pp. 1004-1005.) "The stronger the employer's showing of a legitimate, nondiscriminatory reason, the stronger the plaintiff's evidence must be in order to create a reasonable inference of a discriminatory motive." (*Featherstone*, *supra*, 10 Cal.App.5th at p. 1159.)

"With direct evidence of pretext, ' "a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." [Citation.]' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69.) In contrast, " ' "[c]ircumstantial evidence of ' "pretense" must be "specific" and "substantial" in order to create a triable issue with respect to whether the employer intended to discriminate' on an improper basis." ' (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 834.)" (*Husman*, *supra*, 12 Cal.App.5th at p. 1182.)

Here, there is no direct evidence that Safeway acted with a discriminatory motive. (See *Batarse v. Service Employees Internat. Union, Local 1000, supra,* 209 Cal.App.4th at pp. 834-835 [Direct evidence is evidence that if believed will prove the particular fact in question without reliance upon inference or presumption. It may take the form of admissions by a decision maker that the adverse employment action was taken because of the employee's membership in the protected class].)

With respect to circumstantial evidence, the primary evidence LePage can offer is the timing of his termination—he was terminated while on medical leave for his back pain. Yet, "[a]lthough temporal proximity, by itself, may be sufficient to establish a prima facie case of discrimination or retaliation, it does not create a triable fact as to pretext once the employer has offered evidence of a legitimate, nonprohibited reason for

its action. This is especially so where the employer raised questions about the employee's performance *before* he engaged in protected activity, and the subsequent discharge was based on those performance issues." (*Arteaga*, *supra*, 163 Cal.App.4th at pp. 334-335, 353; see also *King*, *supra*, 152 Cal.App.4th at p. 436 ["[A] disabled employee has no greater prerogative to compromise his integrity than any other employee. The mere fact that [the employer] found plaintiff had breached its integrity policy shortly after returning to work is insufficient to raise an inference that his blood disorder prompted his discharge"].)

LePage began his medical leave for his back pain while already on paid administrative leave to allow Safeway to finish its investigation while minimizing the risk that he would compromise that investigation by speaking with store employees. While on leave, he disobeyed directives and called the store. In this context the temporal proximity between when LePage began medical leave and when Safeway terminated him is not alone substantial enough evidence for LePage's claim to survive summary judgment.

LePage tries to convince this court that the temporal proximity of his termination is sufficient evidence in two ways, neither of which is persuasive. First, in the introductory portion of his brief, he implies Safeway began taking a closer look at his behavior following leaves of absence he took (1) in late 2016 to early 2017 to care for his foot, and (2) in late 2017 to care for his mother-in-law. Thus, LePage suggests the leave period we should look at as triggering Safeway's actions is not just his June 2018 medical leave, but also the earlier two periods of leave. But, to begin with, the citations LePage provides regarding his late 2016 to early 2017 leave say nothing about the purpose of that leave. And LePage took the late 2017 leave to take care for family, not due to a personal medical condition or disability.

Finally, even framed in the context of all 2017 and 2018 leave periods, LePage's argument is still rooted in the temporal proximity of when LePage took the periods of

31

leave and when he was terminated. In the face of the strong evidence that shows Safeway terminated LePage because it had lost confidence in him and he violated Safeway policies—e.g., the Complaint Summary, the interview records in the incident report, Mason's testimony regarding his role in the investigations, and LePage's deposition—this temporal proximity alone does not carry LePage's burden on summary judgment. (See *Featherstone*, *supra*, 10 Cal.App.5th at pp. 1158-1159.)

Next, LePage quotes the following from *Arteaga*, *supra*, 163 Cal.App.4th at pages 353-354 and argues he has satisfied his burden: "In the classic situation where temporal proximity is a factor, an employee has worked for the same employer for several years, has a good or excellent performance record, and then, after engaging in some type of protected activity—disclosing a disability—is suddenly accused of serious performance problems, subjected to derogatory comments about the protected activity, and terminated. In those circumstances, temporal proximity, together with the other evidence, may be sufficient to establish pretext."

LePage suggests his 41 years of employment, coupled with the fact that prior to December 2017 he only had a record of four written warnings for policy violations offers enough additional evidence to satisfy his burden to provide evidence other than temporal proximity to support his claim of pretext. We disagree that this was enough. Indeed, the evidence of prior incidents suggests both that (1) LePage had been warned of the importance of carefully complying with Safeway's policies and should have been more cautious when the 2018 incidents arose; and (2) LePage's behavior became more careless, or at least more of a liability for Safeway, in 2018, when the number of complaints made in a short period of time increased significantly. While LePage may wish to characterize the 2018 complaints as "baseless," there was ample evidence that Safeway's conclusions regarding those complaints were not baseless. These complaints were made and the investigation into them had significantly progressed *before* LePage took medical leave. The documents submitted reflect HR representatives and Mason

32

interviewed the parties involved, and that Mason considered the substance of those interviews in reaching his conclusions.  And nothing in the record suggests someone with authority to terminate LePage played a role in generating the complaints about LePage in 2018, or that LePage was actually subject to a like volume of complaints in prior years and that Safeway ignored them.

On this record, LePage could not show Safeway's legitimate reasons to terminate him were pretext.

DISPOSITION

We affirm the judgment.  Safeway shall recover its costs on appeal under California Rules of Court, rule 8.278(a).

_____

HULL, Acting P. J.

We concur:

_____

RENNER, J.

_____

ASHWORTH, J.*

_____

\* Judge of the El Dorado County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.